**Margaret Cameron Bolton CLIFTON, Appellant,**

v.

**Edward Cameron Nind HOPKINS and First National Bank of Temple, Appellees.**

**No. 10-02-075-CV.**

Court of Appeals of Texas, Waco.

May 7, 2003.

Aubrey R. Williams, Montez, Williams & Baird, P.C., Waco, for Appellant.

Pat Beard and David B. Kultgen, Beard & Kultgen, Artie G. Giotes and Jim Hering, Pakis, Giotes, Page & Burleson, P.C., Waco, for Appellee.

Before Chief Justice DAVIS, Justice VANCE, and Justice GRAY.

## OPINION

BILL VANCE, Justice.

Margaret Clifton is the primary beneficiary of three trusts, and her son, Edward Cameron Nind Hopkins, is the contingent remainder beneficiary. The First National Bank of Temple ("Bank") was the trustee of these three trusts. There is also a fourth trust involved in this appeal, a "Qualified Personal Residence Trust" which concerns Clifton's residence ("Residence Trust"); Hopkins is the beneficiary of that trust.

Clifton filed a lawsuit in October 1997 against Hopkins and the Bank to have her rights regarding the trusts declared and to have other matters related to the trusts resolved. In June 1999, she amended her petition for the fourth time and added a claim for common-law fraud against Hopkins, alleging that he made false promises to her to induce her to set up the Residence Trust and make other gifts to him. Also in the amended petition, she added a claim against the Bank for breach of fiduciary duty regarding two of the other three trusts. For these two trusts, the Bank began in 1996 to allocate 27.5% of the proceeds from oil and gas lease bonuses and royalties to the principal of the trusts, which amount Clifton asserted should have been distributed to her as income.

Hopkins and the Bank filed motions for summary judgment as to the fraud and

breach-of-fiduciary-duty claims, which the court granted.[1] Clifton appeals from the judgment on those claims.

Finding the summary judgment proper, we will affirm.

### Traditional Summary Judgment Standard of Review

"Rule 166a provides a method of summarily terminating a case when it clearly appears that only a question of law is involved and that there is no genuine fact issue." *Rhone–Poulenc, Inc. v. Steel,* 997 S.W.2d 217, 222 (Tex.1999). The movant has the burden to prove by summary-judgment evidence that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law on the issues expressly set out in the motion." *Id.; Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 548 (Tex.1985); Tex.R. Civ. P. 166a(c). If the movant for summary judgment is a defendant, then the movant must negate at least one of the elements of the non-movant's cause of action, or, alternatively, the movant must conclusively establish each element of an affirmative defense. *Randall's Food Mkts., Inc. v. Johnson,* 891 S.W.2d 640, 644 (Tex.1995). The non-movant need not respond to the motion for summary judgment unless the movant meets its burden of proof. *Rhone–Poulenc, Inc.,* 997 S.W.2d at 222–23. But if the movant meets its burden of proof, the non-movant must present summary-judgment evidence to raise a fact issue. *Centeq Realty, Inc. v. Siegler,* 899 S.W.2d 195, 197 (Tex.1995). We review a summary judgment *de novo. Rucker v. Bank One Texas, N.A.,* 36 S.W.3d 649, 653 (Tex.App.-Waco 2000, pet. denied). In conducting our review, we must accept as true all evidence that is favorable to the non-movant, and we must resolve all doubts and indulge every reasonable inference regarding the existence of a genuine issue of fact in favor of the non-movant. *Rhone–Poulenc, Inc.,* 997 S.W.2d at 223; *Nixon,* 690 S.W.2d at 548–49.

### The Fraud Claim Against Hopkins

The elements of fraud are:

(1) a material representation;

(2) which was false;

(3) which was either known to be false when made or made recklessly without knowledge of its truth;

(4) which was intended to be acted or relied upon;

(5) which was acted or relied upon; and

(6) which caused injury or damage.

*E.g. Formosa Plastics v. Presidio Engineers,* 960 S.W.2d 41, 47 (Tex.1998); *Spoljaric v. Percival Tours, Inc.,* 708 S.W.2d 432, 434–35 (Tex.1986). If the alleged misrepresentation involves a promise to perform an act in the future, the plaintiff must prove that, when the promise was made, the defendant intended not to perform. *Formosa Plastics,* 960 S.W.2d at 48; *Spoljaric,* 708 S.W.2d at 434.

Clifton claimed that, to induce her (a) into establishing the Residence Trust[2] in 1991, by which ownership of her personal residence would pass to Hopkins in 2001

---

1. Additional claims asserted in the lawsuit were otherwise resolved and are not at issue in this appeal, *e.g.,* requests that provisions of the trusts be amended, for the substitution of a successor trustee, and for attorney's fees.

2. A "Qualified Personal Residence Trust" is a vehicle, authorized by the Internal Revenue Code, to reduce estate taxes, by which the owner of a residence sets up an irrevocable trust, conveys the residence to the trust as its principal (corpus), and continues to live in the residence until the trust terminates, after which the residence passes to the beneficiary. After the trust terminates, the owner may be allowed to remain in the residence, but to preserve the tax benefits, the owner must pay fair market rental value.

when the trust terminated, and (b) to make other gifts to Hopkins, such as mineral interests and a monthly allowance, he falsely promised "to accommodate [Clifton's] desire and need to remain in her residence upon termination of the [Residence Trust], and ... to accommodate [Clifton's] need for a sufficient level of income from the [other trusts] so as to maintain her customary lifestyle." Specifically, Clifton asserted that, even though the terms of the Residence Trust provide her no legal right to remain in the residence, Hopkins had promised that she could reside there if she paid a fair market rental value. She alleged he had repudiated the promised inducement and did not intend to keep the promise when the trust terminated. As for future income, Clifton asserted that Hopkins promised Clifton that it would be sufficient to maintain her lifestyle, but he broke that promise by opposing her attempt to amend the trusts to override or delete the provisions that allowed the Bank to withhold the reserves for depletion. She said the withholding was lowering her income level and thus her standard of living.

Hopkins filed three motions for summary judgment. In the third motion, a traditional one from which this appeal derives, he argued there is no evidence of several of the elements of fraud, because: (a) the Residence Trust had not yet terminated, and there was no evidence of what he *might* do in the future when it did terminate (no false material representation—elements 1 and 2); (b) there was no evidence that, when he allegedly made the promise about the residence in 1991, he intended to not fulfill the promise (no intent not to perform—element 3); (c) the evidence conclusively establishes that the alleged misrepresentation about future income was made in a letter long after the creation of the Residence Trust, and thus Clifton could not have relied on the mis-

representation at the time she created the Residence Trust (no reliance—element 5); (d) the evidence conclusively establishes that Hopkins never expressly promised Clifton a level of future income (no false material representation—elements 1 and 2); and (e) the evidence conclusively establishes that Clifton's level of income had not declined (no injury or damage—element 6).

The summary judgment evidence relied on by the parties concerning the fraud claim consists of excerpts from a deposition and an affidavit, both given by Clifton. Hopkins relies on the deposition, and Clifton relies on the affidavit.

In a summary-judgment affidavit dated September 3, 1999, made after the fraud claims were added, Clifton stated that Hopkins "assured me he was willing to accommodate my desire and need to remain in my residence upon termination of the [Residence Trust]. [He] specifically told me that he understood and would accommodate my need for a sufficient level of income so as to maintain my customary lifestyle." She said that, only in reliance on these "statements and assurances," did she set up the Residence Trust. But later, Hopkins "proceeded to tell me ... he would not give me any assurance that I could remain in the house ..., [and] he proceeded to tell me ... that he would not agree to the elimination, or even° the reduction, of the 27.5% reserve for depletion ..., unless, perhaps, I enter[ed] into a contractual will leaving everything to him."

But in a deposition on October 11, 1999, taken in part to explore the statements in the affidavit, Clifton testified: (1) Hopkins never told her that she could not continue to live in the residence and pay rent; (2) she was speculating that, when the trust terminated, Hopkins would not let her continue to live in the residence; (3) the

"sole basis" for her speculation was a letter Hopkins wrote her in September 1997, a month before she filed the lawsuit, and from which "she knew that he would eventually do everything he could to take everything away from me. But it's not written anything about the house in this letter."; (4) she never discussed with Hopkins a necessity for her to have a sufficient level of income; and (5) although the 1997 letter is also the sole basis of her allegation that Hopkins promised to accommodate her need for future income, there was nothing in the letter about that.

The testimony from Clifton's deposition shows the following:

- There was no evidence that Hopkins intended, in 1991 or later, to not allow Clifton to live in the residence after the Residence Trust terminated.
- The evidence conclusively established that Hopkins did not make Clifton a promise about her future income.
- The evidence conclusively established that, if Hopkins made a misrepresentation about future income, it was made in a letter long after the creation of the Residence Trust, and so Clifton could not have relied on it when she established the trust.

Thus, based on her deposition testimony, Clifton's fraud claim fails on the elements of intent not to perform, material misrepresentation, and reliance.

■ Clifton, however, argues that her affidavit conflicts with her deposition testimony and creates a fact issue about these elements. A party's testimony that is in conflict with other of its testimony may create a fact issue. *Thompson v. City of Corsicana Housing Auth.*, 57 S.W.3d 547, 557 (Tex.App.-Waco 2001, no pet.). But we do not agree with Clifton. Her affidavit states in general terms that Hopkins told Clifton she could remain in the residence and that he would "accommodate" her need for future income, but that he later told her she could not remain in the residence and he would oppose amending the trusts to eliminate the reserve provisions. However, the affidavit provides no details about how and when these promises were allegedly made or broken. Her deposition testimony, on the other hand, refers specifically to how and when the promises were allegedly made and broken. Thus, the deposition testimony does not contradict the statements in the affidavit but, rather, supplements and explains them. And the explanation shows that her sworn statements, taken together, do not support the fraud claim. Instead, they negate several elements of her fraud claim, the failure of any one being adequate to justify the summary judgment. *Randall's Food Mkts.*, 891 S.W.2d at 644.

We find no genuine issue of material fact. Hopkins has successfully negated elements of Clifton's fraud claim. TEX.R. CIV. P. 166a(c); *Rhone–Poulenc*, 997 S.W.2d at 222. The summary judgment was properly granted as to Hopkins, and we overrule the issue.

### The Breach of Fiduciary Duty Claim Against the Bank

Provisions in two of the three trusts (other than the Residence Trust) give the Trustee "full power to determine the manner in which . . . receipts are to credited as between principal and income, and also to determine what shall constitute income or net income, and what shall constitute corpus or principal, and [the Trustee] may withhold from income any reserves for depreciation or depletion as the Trustee may deem fair and reasonable. In determining such matters the Trustee may give consideration to the provisions of . . . the Texas Trust Act . . . but shall not be bound by such provisions." The Trust Act allows a trustee to allocate certain mineral-interest

proceeds to principal in an amount equal to the lesser of 27.5% of gross proceeds or 50% of net revenues (gross proceeds minus expenses and carrying charges). TEX. PROP.CODE ANN. § 113.107(d) (Vernon 1995). In 1996, two years after being appointed successor trustee, the Bank began to allocate 27.5% of the proceeds from oil and gas lease bonuses and royalties to the principal of the trusts. Such an allocation protects the interests of the contingent remainder beneficiary. *Id.* § 113.101 (Vernon 1995) (duty of trustee to remaindermen). Trustees prior to the Bank had not implemented the allocation or reserve provisions of the trusts.

■ Clifton alleged in her fourth amended petition, without any specifics, that the Bank breached its fiduciary duty to her by making the allocations to principal which should have been distributed to her as income. In later summary judgment pleadings and evidence, she alleged that, even though trust provisions allowed for the allocations, doing so injured her by decreasing her income flow, which the Bank ignored even though it knew that previous trustees had not made the allocations. Thus she says the Bank violated its fiduciary duty to guard her welfare. She also alleged that the Bank, in instituting the allocations, was only protecting itself from a possible lawsuit by Hopkins for failing to properly look after the trust principal, and therefore the Bank was looking out for its own interests, not hers.

The Bank filed a traditional summary judgment motion[3] asserting that, as a matter of law, the breach-of-fiduciary-duty claim fails because:

- The two trusts contain nearly identical exculpatory clauses that the "Trustee shall not be liable for any mistake or error of judgment or negligence, but each Trustee shall be liable **only** for his [or its] own personal acts of dishonesty." [Emphasis added.] Thus, because Clifton does not allege any personal acts of dishonesty, any other acts which might be a breach of fiduciary duty are excluded by the express terms of the trusts.

- The trusts specifically authorize the Trustee to allocate receipts between principal and income and to follow the Texas Trust Code, which by its express terms provides a 27.5% allocation of these mineral proceeds to principal. Thus, because the Bank followed the terms of the trusts and the Trust Code, it cannot be in breach of a fiduciary duty.

- When the Bank was appointed as successor Trustee in 1994, the agreed judgment which accomplished that stated, in part: The Bank "... is hereby relieved of any duty which it would otherwise have to inquire into and satisfy itself as to the acts of" any previous trustees. Thus, the Bank is not bound by the decisions of prior trustees to not allocate the proceeds, so that cannot be a breach of fiduciary duty.

In response to Clifton's summary judgment affidavits, the Bank filed objections that the affidavits were conclusory and therefore constituted no evidence. The record does not indicate that the trial court ever ruled on the objections.

We agree with the Bank's argument about the exculpatory clauses. The evidence conclusively establishes that the Bank is not liable to Clifton, if these clauses are valid.

---

3. The Bank also filed a no-evidence summary judgment motion complaining that there is no evidence of breach of fiduciary duty. Given our disposition of the traditional summary judgment motion, we need not consider the no-evidence motion.

The Texas Trust Code sets forth both a general duty for trustees and a standard for trust management:

- "A trustee shall administer the trust according to its terms and this subtitle. In the absence of any contrary terms in the trust instrument or contrary provisions of this subtitle, in administering the trust the trustee shall perform all of the duties imposed on trustees by the common law." *Id.* § 113.051 (Vernon 1995).

- "Unless the terms of the trust instrument provide otherwise, a trustee shall exercise the judgment and care under the circumstances then prevailing that persons of ordinary prudence, discretion, and intelligence exercise in the management of their own affairs …." *Id.* § 113.056(a) (Vernon 1995).

And the Code specifically allows, subject to exceptions not relevant here, a settlor to relieve the trustee of statutory and common law duties. *Id.* § 113.059 (Vernon 1995).[4]

The Texas Supreme Court has recently affirmed that exculpatory clauses in trusts regarding the statutory and common-law duties of trustees are valid under the Trust Code and are not precluded by public policy. *Texas Commerce Bank, N.A. v. Grizzle*, 96 S.W.3d 240, 248 (Tex.2002). In *Grizzle*, a case involving alleged self-dealing by the trustee, the Court held that "the trust Code authorizes a settlor to exonerate a corporate trustee from almost all liability for self-dealing," such as misapplying or mishandling trust funds, including failing to promptly reinvest trust monies. *Id.* at 250. Applying *Grizzle* to the Clifton trusts, and absent an allegation of a personal act of dishonesty or any proof thereof, there is no issue of fact about

whether the Bank is exculpated from any wrongdoing regarding its allocation of the proceeds. Tex.R. Civ. P. 166a(c); *Rhone–Poulenc*, 997 S.W.2d at 222.

We overrule the issue. Accordingly, we do not reach the Bank's other arguments in favor of summary judgment.

### *Conclusion*

Having overruled Clifton's issues, we affirm the judgment.

---

4. There are two exceptions that prohibit a corporate trustee from making loans of trust funds to enumerated persons and buying and selling trust property. Tex. Prop.Code Ann. §§ 113.052, 113.053 (Vernon 1995).